2023 IL App (1st) 211422
No. 1-21-1422
Opinion filed November 17, 2023

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CR 09924 |
| QUINTON GATES, | ) ) | The Honorable Charles P. Burns, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Coghlan concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        Quinton Gates, 18 years and 2 months at the time of the offense, was convicted of first degree murder. Gates raises two issues: (i) the constitutionality of our supreme court's administrative order, M.R. 30370 (*In re Illinois Courts Response to COVID-19 Emergency/Impact on Trials*, Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020)), tolling of the speedy trial term during the recent pandemic and (ii) ineffective assistance of counsel at sentencing.

¶ 2        We find no violation of Gates's right to a speedy trial. As to ineffective assistance, we find his counsel failed to challenge Gates's sentence as a *de facto* life sentence. Not receiving effective

representation at sentencing is constitutionally offensive and fundamentally wrong. Accordingly, we vacate his sentence and remand for resentencing.

¶ 3                                    Background

¶ 4                                    *Trial Delay*

¶ 5         On June 7, 2017, 18-year-old Quinton Gates was arrested for murder. Gates appeared in bond court on June 9 and was arraigned on July 14. Gates's trial was initially scheduled for November 11, 2019, but continued by agreement to December 2 so the State could subpoena three witnesses. On December 2, Gates demanded trial. On February 28, 2020, the State sought and was granted a continuance to March 23.

¶ 6         On March 17, 2020, the Illinois Supreme Court issued M.R. 30370, directing courts to conduct nonessential matters remotely and reschedule criminal cases until 30 days after the Governor's state of emergency ended. *In re Illinois Courts Response to COVID-19 Emergency*, Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). The court noted that the order "serve[d] the ends of justice and outweigh the best interests of the public and defendants in a speedy trial." *In re Illinois Courts Response to COVID-19 Emergency/Impact on Trials*, Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020).

¶ 7         Finally, on June 30, 2021, the supreme court reinstated the speedy trial term beginning October 1, 2021, so dates before March 20, 2020, and after October 1, 2021, would be included in computing time for speedy trial purposes. *In re Illinois Courts Response to COVID-19 Emergency/Impact on Trials*, Ill. S. Ct., M.R. 30370 (eff. June 30, 2021).

¶ 8         The sequence of relevant events for Gates's speedy trial term can be summarized as follows:

GATES'S SPEEDY TRIAL TERM TIMELINE

| Date | Event | Speedy Trial Term Day | Acting party |
|---|---|---|---|
| 6/7/17 | Arrest | | State |
| 6/8/17 | Speedy trial term begins | Day 1 | State |
| 7/14/17 | Arraignment | | Circuit Court |
| | First continuance by agreement; 37 total days by agreement until 12/2/19 | Day 37 | State and Gates |
| 12/2/19 | First demand for trial—Speedy trial term resumes | Day 38 | Gates |
| | State unable to subpoena witnesses | | State |
| 1/6/20 | Second demand for trial | Day 73 | Gates |
| 1/13/20 | Third demand for trial | Day 80 | Gates |
| | Fourth demand for trial | Day 112 | Gates |
| 2/14/20 | State granted 60-day continuance under 725 ILCS 5/103-5(c); case continued by motion, tolling until 4/14/20 | | State |
| 2/28/20 | Fifth demand for trial | Day 112 | Gates |
| 3/16/20 | Sixth demand for trial | Day 112 | Gates |
| 3/17/20 | Supreme Court issues M.R. 30370 | Day 112 | Supreme Court |
| 3/20/20 | M.R. 30370 begins tolling of speedy trial term | Day 112 | Supreme Court |
| 4/14/20 | 60-day tolling per State's 725 ILCS 5/103-5(c) motion ends; term tolled under M.R. 30370 | Day 112 | |
| 4/21/20 | Denial of Gates's motion to dismiss for violation of right to speedy trial and due process | | Circuit court |
| 4/22/20 | Seventh demand | Day 112 | Gates |
| 4/27/20-4/27/21 | Gates demands trial 19 times; term still tolled under M.R. 30370 | Day 112 | Gates |
| 5/4/21 | Trial | Day 112 | Circuit Court |

¶ 9                                *Trial Evidence*

¶ 10         At trial, the State presented testimony from several witnesses.

¶ 11    Two witnesses, sisters Tremia Gilmore and Ishonna Gilmore, testified that they resided in a three-flat building with their other siblings in a neighborhood claimed as "Lowe Life" gang territory. On the evening of the shooting, they were with their cousin, a member of the Lowe Life gang, when Gates arrived and asked for him.

¶ 12    Terence Evans, who lived on the second floor, heard about seven shots. Evans went to the back and saw Gates shoot the cousin twice and yell "F*** Lowe Life" before leaving.

¶ 13    Several police investigators testified about their participation in the investigation. Detective Jeremy Morales testified that, the night of the shooting, he spoke to the Gilmore sisters and Evans outside the building. All three identified Gates by his nickname, "Man Man." With that information, Morales created a photo array, which included Gates's photo. The next day, at the station, the Gilmore sisters and Evans identified Gates from his photo as the shooter.

¶ 14    Gates testified that he knew the Gilmore sisters, Evans, and the victim and had been friends until they affiliated with the "Lowe Life" gang. Gates ended the friendship in 2016, as he belonged to a rival gang. Gates denied being in Englewood on the day of the shooting.

¶ 15    The jury found Gates guilty of first degree murder and discharge of a firearm causing death. 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 16    *Sentencing*

¶ 17    At the time of the sentencing hearing, Gates had served four years, four months, and eight days in prison since his arrest. The State called two witnesses and provided a statement by the victim's mother. Before imposing sentence, the court asked both attorneys, "Do you think the firearm enhancements are mandatory for the defendant?" See 730 ILCS 5/5-4.5-105(b), (c) (West 2020). After some back-and-forth, the State answered, "I believe it is not discretionary." Defense counsel later stated, "I would just say if there was ambiguity, it should be resolved in Quinton's

favor. I think the trend in the law has been to move away from mandatory minimums when it comes to juvenile offenders and to allow judges more discretion."

¶ 18    In mitigation, the defense presented two documents: Gates's high school diploma from York Alternative High School in June 2020 and an e-mail from one of the coordinators of the Alternative Programs and Education Department of the Cook County Department of Corrections verifying that Gates participated for nine months in the "Second Chance Program" and three months in the "Becoming a Man" program while in custody. Gates did not speak in elocution or submit to a presentence investigation interview.

¶ 19    The defense provided a sentencing memorandum. When Gates was 12, his mother, employed by the Chicago Transit Authority and the primary breadwinner, died suddenly. His father had occasional employment, and after Gates and his father were evicted from their home, they moved to Englewood. When his father went to prison for a federal gun offense, Gates lived with relatives, some of whom belonged to a gang.

¶ 20    Gates experienced more tragic loss. An older cousin and positive role model and mentor, Quintonio LaGrier, had mental health challenges but had attended college and worked part-time. During an episode at home, family members called police. A responding officer shot and killed LaGrier and a neighbor. Shortly afterward, one of Gates's close friends was shot and killed. Defense counsel noted that Gates never received therapy or counseling for coping with his losses at a young age.

¶ 21    The court asked, "But the statutory factors are pretty clear that somebody has to be under the age of 18 for either the firearm enhancement or for the consideration of the *Miller* factors that were codified. Correct?" Defense counsel answered: "I think that that—sure, your Honor, is what the statute says. I think if there is any ambiguity, it must be resolved in [Gates's] favor."

¶ 22    The trial court pronounced the sentencing option for this charge was 20 to 60 years of imprisonment before the firearm enhancement of 25 years. The trial court sentenced Gates to a total of 48 years imprisonment—23 years for murder plus 25 years under the habitual criminal statute for gun enhancement (*id.* § 5-4.5-95(b)). This sentence carries the possibility of parole after 20 years because Gates was under 21 at the time of the offense. *Id.* § 5-4.5-115(b).

¶ 23    To reach this sentence, the trial court recognized that, when the crime occurred, Gates was just two months past his eighteenth birthday. The trial court considered the *Miller* factors and whether a mandatory firearm enhancement was required. See *Miller v. Alabama*, 567 U.S. 460, 477-78 (2012); Ill. Const. 1970, art. I, § 11; 730 ILCS 5/5-8-1 (West 2020).

¶ 24    The *Miller* factors led the court to sentence Gates toward the lower end of the sentencing range. The court considered Gates's age to merit a lower sentence but found no evidence Gates lacked the maturity to understand his actions. In mitigation, the court considered the hardships caused by his mother's death when he was 12, his father's incarceration, and the violent deaths of extended family members and others close to him. The court also noted that Gates completed his high school diploma and participated in programs and activities while incarcerated.

¶ 25    In aggravation, the court discussed jail offenses for which Gates was reprimanded, noting that, although some were minor, like not wearing a face mask and hanging clothes inside his cell, some involved violence or disrespect for authority. In addition, Gates acted alone in committing the crime.

¶ 26    The court ruled that the proportionate penalties clause did not apply to Gates because he was the principal, not an accomplice. The court further stated,

> "[t]he Illinois Supreme Court has cleared up one particular issue in the—I believe it is the [*People v. Dorsey*, 2021 IL 123010,] case that was decided earlier this year, that it is the

eligibility for parole that is determinative as to whether or not something is a *de facto* life, not the actual parole date. So any way you look at it, the defendant is eligible for parole within 20 years."

¶ 27                                   Analysis

¶ 28                              *Constitutionality*

¶ 29        Gates argues that the Illinois Supreme Court's emergency COVID-19 orders tolling the time restrictions set out in section 103-5 of the Code of Criminal Procedure of 1963 (referred to as the speedy trial statute) (see 725 ILCS 103-5(a) (West 2020)) violated the separation of powers principles in article II, section 1, of the Illinois Constitution (Ill. Const. 1970, art. II, § 1). In *People v. Mayfield*, 2023 IL 128092, decided after the briefing, the supreme court disposed of this issue, upholding the constitutionality of the orders. *Mayfield* controls, and Gates made no other arguments. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 30                             *Speedy Trial Term*

¶ 31        Next, we determine whether Gates's right to a speedy trial was violated. We apply an abuse of discretion standard with deference to the trial court's determination on the party responsible for a delay. *People v. Kliner*, 185 Ill. 2d 81, 115 (1998). We review *de novo* whether the trial court violated Gates's right to a speedy trial. *People v. Ballard*, 2022 IL App (1st) 210762, ¶ 22 (citing *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 56)).

¶ 32        Both the sixth amendment and the due process clause of the federal constitution (U.S. Const., amends. VI, XIV; *Klopfer v. North Carolina*, 386 U.S. 213 (1967)), and article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, § 8) guarantee a defendant's right to a speedy trial. *Mayfield*, 2023 IL 128092, ¶ 18. Under Illinois statute, the trial must commence within 120

days after a defendant is taken into custody unless he or she agrees to a continuance or causes delay—which tolls the speedy trial term. 725 ILCS 5/103-5(a) (West 2020); *People v. Reimolds*, 92 Ill. 2d 101, 106 (1982). The State also may apply for not more than an additional 60-day extension to obtain evidence under certain circumstances. See 725 ILCS 5/103-5(c) (West 2020). Defendants must object through written or oral demand for trial to prevent delays from being attributed to them. *Id.* § 103-5(a). In calculating the days in custody, the first day is excluded, and the last day is included. *People v. Bivins*, 97 Ill. App. 3d 386, 392 (1981). Under *Bivins*, Gates's speedy trial term began on June 8, 2017.

¶ 33        As the timeline indicates, on July 14, Gates agreed to a continuance, pausing the clock at 37 days. See *Reimolds*, 92 Ill. 2d at 106. After the first demand for trial, Gates made three more demands between January 6, 2020, and February 14, 2020, amounting to 112 days. The State's February 14, 2020, motion tolled the term for 60 days not attributable to the State. *Id.*; 725 ILCS 5/103-5(c) (West 2020).

¶ 34        In the wake of *Mayfield*, Gates's trial commenced within 120 days. While extraordinary circumstances led to the delay, the extraordinary circumstances did not cause a violation of Gates's right to a speedy trial.

¶ 35                                        *Excessive Sentencing*

¶ 36        Gates argues that his sentence of 48 years is unconstitutional as a *de facto* life sentence that violates his constitutional rights under the proportionate penalties clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11). The proportionate penalties clause requires courts to determine all penalties based on the seriousness of the offense and with the objective of restoring the offender to useful citizenship. *Id.* A sentence's constitutionality presents a question of law we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 37                                    *Possibility of Parole*

¶ 38         Gates's sentence came after the law was changed to make a person convicted of first degree murder eligible for parole after serving 20 years, if under 21 years old at the time of the offense, and the sentencing occurred after the law took effect. 730 ILCS 5/5-4.5-115(b) (West 2020). "This legislation was enacted in response to emerging case law to address 'youthful offenders under the age of 21.' " *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 37 (quoting *People v. Green*, 2022 IL App (1st) 200749, ¶ 41).

¶ 39         The legislature has the power to define a criminal offense and fix the punishment, whereas "the imposition of the sentence within the limits prescribed by the legislature is purely a judicial function." *People v. Lewis*, 88 Ill. 2d 129, 196 (1981) (Ryan, J., dissenting, joined by Goldenhersh, C.J., and Clark, J.); *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 52. (citing *People ex rel. Kubala v. Kinney*, 25 Ill. 2d 491, 493-94 (1962) ("legislature may change the terms and conditions for parole")).

¶ 40         The State contends that Gates "is not foreclosed from achieving a meaningful chance at rehabilitation after 20 years" because he will be eligible for parole then. So, according to the State, Gates's 48-year sentence does not equate to a *de facto* life term under *People v. Buffer*, 2019 IL 122327, ¶¶ 27, 41 (prison sentence for juveniles not exceeding 40 years is not life term), or *Miller* (*Miller*, 567 U.S. at 469-70 (forbidding mandatory life terms for juvenile offenders)), "insofar as it adequately affords [Gates] opportunities for rehabilitation." In oral argument, the State relied on *People v. Dorsey*, where the supreme court considered good conduct credit a relevant inquiry regarding the proportionate penalties clause. *People v. Dorsey*, 2021 IL 123010; 730 ILCS 5/3-3-3(c) (West 1994).

¶ 41       *Dorsey*, however, is inapplicable. The good conduct credit statute allows inmates to have time taken off their sentences for daily good behavior, allowing a "predictable, fairly accurate assessment at the time of sentencing of the ultimate length of imprisonment," and usually inmates serve half of their sentence. *Dorsey*, 2021 IL 123010, ¶¶ 51-52. Further, *Dorsey* focused on the " 'power' " that inmates have to shorten their sentence because their behavior, not a subjective board determination, determines whether a day is counted towards their sentence. *Id.* ¶¶ 52-53; see *People v. Brakes*, 2021 IL App (1st) 181737, ¶ 38 ("Because the consecutive six-year sentences are eligible for 50% credit, they give him the 'power' to behave and potentially achieve release before he has served 40 years.").

¶ 42       In Illinois, inmates are given credit as long as no infraction occurs, and even then, inmates can earn lost credit back. See State of Ill. Prisoner Review Bd., 44th Annual Report, January 1 to December 31, 2020, at 5 (July 2022), https://prb.illinois.gov/content/dam/soi/en/web/prb/documents/prb20anlrpt.pdf [https://perma.cc/2VUF-PFZX] ("The Board is further authorized to review IDOC recommendations for restoration of lost credits in cases in which an inmate's good behavior appears to merit such a reward."). *Dorsey* found the good conduct credit statute applicable to remedy the potential issue of a *de facto* life sentence. But, of the utmost importance here, inmates like Gates are not afforded any opportunity to lessen their sentence beyond applying for parole after serving 20 years, and then with low expectations of success.

¶ 43       A prisoner has no due process right to a parole hearing. *Hill v. Walker*, 241 Ill. 2d 479, 487 (2011). As *Dorsey* recognized, parole is not a right, and if an individual is denied parole, no review is available. *Dorsey*, 2021 IL 123010, ¶ 56. Indeed, a defendant can take no viable action to challenge a parole board's finding. The defendant in *Dorsey* faced an entirely different future with

"an opportunity to demonstrate maturity and rehabilitation so that he only needs to serve 38 years of his aggregate 76-year sentence." *Id.* ¶ 50.

¶ 44    The State urges that we follow *People v. Elliott*, 2022 IL App (1st) 192294, where a panel of this court applied *Dorsey*'s analysis of the good conduct statute (730 ILCS 5/3-3-3(c) (West 2020)) to the parole statute. We find the rationale of *Elliott*, the first appellate case to reach the issue, seriously flawed. Parole differs conceptually from good conduct credit. Parole is a legislative function. There is no right to parole nor opportunity for judicial review. So, categorizing parole as some type of pilot release is misconceived.

¶ 45    The possibility of parole is impossible to determine. See *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 8 (1979) ("[i]n parole releases, *** few certainties exist"); *Hanrahan v. Williams*, 174 Ill. 2d 268, 276 (1996) (no right to parole). Gates has no right to release from prison before the end of his 48-year sentence.

¶ 46    Under the statute, if, after 20 years, Gates applied for and was denied parole, he would have to wait 10 more years for reconsideration—if the Board denied a second request, he would not have another opportunity. 730 ILCS 5/5-4.5-115(m) (West 2020). In contrast to good conduct credit, under the parole scheme, inmates do not have control over their shortened term and minimal chance for review. See *Hill*, 241 Ill. 2d at 486 (parole is matter of "grace and executive clemency"); *Hanrahan*, 174 Ill. 2d at 276 (board has discretion to grant parole). According to the Illinois Prisoner Review Board, in 2020, only 44 adult parole reviews were even considered; of those, about 22% were granted. See State of Ill. Prisoner Review Bd., 44th Annual Report at 8. Similarly, in 2019, the parole board considered 51 cases and granted less than 30%. See Ill. Prisoner Review Bd., 43rd Annual Report, January 1 to December 31, 2019, at 8 (Feb. 1, 2021), https://prb.illinois.gov/content/dam/soi/en/web/prb/documents/prb19anlrpt.pdf [https://perma.cc/

6P39-NTHG]. In 2017, the parole board denied all 56 cases considered. See State of Ill. Prisoner Review Bd., 41st Annual Report, January 1 to December 31, 2017, at 8 (Apr. 24, 2019), https://prb.illinois.gov/content/dam/soi/en/web/prb/documents/prb17anlrpt.pdf [https://perma.cc/ WU63-8WF7]. These statistics indicate that obtaining parole is inscrutable and difficult to accomplish.

¶ 47    Our parole scheme does not afford offenders like Gates access to the courts or a meaningful opportunity for release and cannot be used to remedy a *de facto* life sentence that violates the proportionate penalties clause. Because parole is inherently different from good time credit, we agree with Gates.

¶ 48    The dissent cites *Cavazos*, 2023 IL App (2d) 220066, on the legislative role in the statute's creation. *Infra* ¶¶ 81-82. The court stated

"[the legislature] considered not only *Miller* and all of its implications, but also victims' rights, the seriousness of offenses (deliberately tailoring waiting periods for petitions based on the offense), and the proper factors to be considered within the Board's authority. In short, the new parole statute affords defendant a meaningful opportunity for release, based on his maturity and rehabilitation, before serving a *de facto* life sentence of over 40 years' imprisonment." *Cavazos*, 2023 IL App (2d) 220066, ¶ 60.

In doing so, the *Cavazos* court noted the legislature deliberately tailored "waiting periods for petitions based on the offense," while also expressing a "hope the legislature reconsiders some parole restrictions (particularly the lengthy period between petition opportunities and foreclosure of opportunities thereafter)." *Id.*

¶ 49    The single word "meaningful" does some heavy lifting in this context. Repetition of the term "meaningful opportunity" does not guarantee that prisoners realistically have the chance to

apply for parole and receive full consideration of the parole board. The lengthy 20-year waiting period before an even seeking parole renders the opportunity close to "meaningless" rather than "meaningful."

¶ 50                                *Emerging Adult Status*

¶ 51        The legislature addressed the different treatment of young adults in the criminal justice system in the Juvenile Court Act of 1987, where the legislature defines minors as those under 21. 705 ILCS 405/1-3(10) (West 2020). Minors may receive a station adjustment after arrest, probation adjustment, and opportunities to participate in community mediation programs, opportunities not available to adults. *Id.* §§ 5-301, 5-305, 5-310. Effective June 1, 2019, the legislature enacted a provision in the Unified Code of Corrections granting defendants under 21 years old at the time of the offense the chance to have parole review after serving homicide sentences 20 years or longer. Pub. Act 100-1182 (eff. June 1, 2019) (amending 730 ILCS 5/5-4.5-115(b)). These changes establish differing treatment for emerging adults, evaluating them more like juveniles than adults for sentencing purposes.

¶ 52        Language included in recent legislation indicates a willingness to recognize differences between "youthful offenders" and individuals over 21 years. It requires the Prisoner Review Board panel to "consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." *Id.* § 5-4.5-115(j).

¶ 53        Although the age of separation between juveniles and adults has been set at 18 by the United States Supreme Court (*Roper v. Simmons*, 543 U.S. 551, 574 (2005)), the concept of emerging adults has been considered and discussed by the courts in Illinois and throughout the nation. While *Miller*-based eighth amendment challenges are not available to young adult

offenders, the Illinois Supreme Court has left open the possibility for a young adult offender to raise an as-applied constitutional challenge to a *de facto* life sentence under the Illinois Constitution's proportionate penalties clause. *People v. Harris*, 2018 IL 121932, ¶ 48. See *People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 25 ("young adults (those between 18 and 21 years old) may rely on the evolving neuroscience regarding brain development in juveniles and its correlation to maturity underpinning the *Miller* decision" to support constitutional challenge to life sentence).

¶ 54   We also find persuasive the discussion of the emerging adult concept in *People v. Ward*, 2021 IL App (1st) 182402-U. In *Ward*, the appellate court found the trial court erred by denying a 19-year-old leave to file a successive postconviction petition challenging the constitutionality of his 45-year sentence, given his age. *Id.* ¶¶ 31-38. The *Ward* court noted the overwhelming amount of research pointing to the need to extend the rights afforded juveniles to "emerging adults," those 18-25 years old. *Id.* Additionally, the *Ward* court addressed the legislature's treatment of 21-year-olds as not-quite adults by restricting their rights to buy alcohol and guns and to engage in gambling, pointing toward different treatment in the judicial process. *Id.* Likewise, in *People v. Murry*, 2022 IL App (1st) 182425-U, ¶ 47, we acknowledged the rationale in *Ward* as it related to the consideration of an "emerging adult[ ]."

¶ 55   Further refining the concept of adulthood, we have described "the line of adulthood" as age 21. *Green*, 2022 IL App (1st) 200749, ¶ 42. *Green* recognized that the recent statutes regarding youthful offenders allowed relief to defendants under 21. *Id.* ¶ 41 (citing 730 ILCS 5/5-4.5-115 (West 2020) and 705 ILCS 405/1-3(2), (10) (West 2018)).

¶ 56   In *People v. House*, 2021 IL 125124, ¶¶ 31-32, the supreme court remanded for second-stage postconviction proceedings where a 19-year-old defendant raised an as-applied challenge to a mandatory life sentence under the proportionate penalties clause. Even though statutes are

presumed constitutional and a petitioner must overcome that presumption by clearly establishing that his or her mandatory sentencing statute is invalid when applied to them, in *House* the supreme court held a fully developed record was necessary to determine unconstitutionality in an as-applied constitutional claim and remanded to allow defendant the opportunity to develop the record. *Id.* ¶¶ 18, 27-29, 32; see *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27 ("The court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' "); see also *People v. Thompson*, 2015 IL 118151, ¶ 44 (suggesting 19-year-old could raise as-applied challenge to mandatory life sentence in postconviction proceeding).

¶ 57    Gates cites several cases holding *de facto* life sentences violate the proportionate penalties clause when applied to emerging adults, even those who were principals in committing the crime. In *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25, this court noted young adults 20 years old and younger may "rely on the evolving neuroscience and societal standards underlying the rule in *Miller*" to support constitutional challenges to life sentences, even an 18-year-old principal actor. See also *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 69 (age 18, principal); *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 25-34 (age 19, principal); *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14 (age 19, guilt by accountability); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-47 (age 19, principal); *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 28-59 (age 18, principal); *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶¶ 109-12 (age 18, principal); *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 67-78 (age 22, principal).

¶ 58      Caselaw on sentencing young defendants continues to evolve, continues to respond to research on the minds of young people, and continues to forge a more humane approach to incarceration. In the midst of this, "[o]ur supreme court opened the door for young adults to invoke *Miller* under the Proportionate Penalties Clause, and it has not closed that door or explicitly limited it to a particular age range." *People v. Crockett*, 2023 IL App (1st) 220128-U, ¶ 32 (citing *Harris*, 2018 IL 121932, ¶¶ 45-48). Recently, the Illinois Supreme Court explained that it "has not foreclosed 'emerging adult' defendants between 18 and 19 years old from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development." *People v. Clark*, 2023 IL 127273, ¶ 87. In *Clark*, the 24-year-old defendant sought to raise a constitutional challenge to a discretionary *de facto* life sentence in a successive postconviction petition. *Id.* ¶ 88. The court held the defendant could not meet the requirements of either prong of the cause-and-prejudice test for filing his proposed successive postconviction petition. *Id.* The court decided it need not resolve the issue of whether defendant's age at the time of the offense would preclude raising a *Miller*-based challenge to his sentence under proportionate penalties clause standards in an initial postconviction petition. *Id.* Of note is the recognition of the "evolving science."

¶ 59      We recognize that this was a senseless crime of violence. That, however, does not preclude Gates from asserting his constitutional claim. A factor pertinent to sentencing was Gates's dismal upbringing. His mother died when he was 12 years old, his father was incarcerated when he was 15, and without a family or finances, Gates was forced to leave his familiar and relatively safe life to live with extended family that included gang members and drug dealers. Gates lost everything as a child and became exposed to violence and crime.

¶ 60     In 2015, Gates's cousin was killed by police gunfire after experiencing a mental crisis. In 2016, Gates's close friend was gunned down in gang violence. Despite all the trauma in his young life, Gates never received counseling or therapy.

¶ 61     At the time of the murder, Gates was barely past his eighteenth birthday, well under 21 years old. Advances in science and law recognize that emerging adults like Gates are less culpable and more capable of rehabilitation than older offenders, especially when the offenders are trapped in violent, crime-ridden neighborhoods. See *People v. Jones*, 2021 IL App (1st) 180996, ¶¶ 1-2 (50-year sentence for 19-year-old defendant vacated and  remanded for resentencing).

¶ 62     A recent unpublished opinion recognized that scientific literature supports the idea that individuals 18 and older at the time of their crimes should not be treated as adults for sentencing purposes. *People v. Vega*, 2022 IL App (1st) 200663-U, ¶ 38, *vacated*, No. 128404 (Ill. Sept. 27, 2023) (supervisory order). Quoting an article from the Center for Law, Brain & Behavior at Massachusetts General Hospital, the court noted, " 'during emotionally charged situations, late adolescents (ages 18-21) respond more like younger adolescents (ages 13-17) than like young adults (22-25) due to differences in brain maturation.' " *Id.* (quoting Ctr. for Law, Brain & Behavior at Mass. Gen. Hosp., White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers (Jan. 27, 2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ [https://perma.cc/9DNX-FZQP].

¶ 63                                    *Ineffective Assistance*

¶ 64     To succeed on a claim of ineffective assistance, a defendant has to show (i) counsel's performance was deficient, (ii) which prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). The errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed" by the constitution. *Strickland*, 466

U.S. at 687. In assessing the performance prong of *Strickland*, a court must "show great deference to counsel's strategic decisions [citation], making every effort to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time." (Internal quotation marks omitted.) *People v. Massey*, 2019 IL App (1st) 162407, ¶ 25.

¶ 65 We find that Gates meets both prongs.

¶ 66 Regarding the first prong, Gates's counsel failed to advocate for a lesser sentence under the proportionate penalties clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11), given the developments on emerging adults in the criminal justice system. Being barely 18 at the time of the crime unequivocally establishes Gates as an emerging adult. Both our legislature and courts have moved toward a better understanding of emerging adults and how their lower culpability and underdeveloped brains should be considered in the criminal justice process.

¶ 67 The trial court asked both sides whether the 25-year firearm enhancement was mandatory, given that Gates was over 18. Counsel for the State and defendant stated that it was likely mandatory. Defense counsel added that ambiguities in the statute should be construed in favor of Gates and was unaware of caselaw to support straying away from a mandatory firearm enhancement sentence. The trial court found the sentencing option was 20-60 years plus the mandatory 25-year enhancement, with a minimum of 45 years: 20 years plus 25. The court believed the proportionate penalties clause did not apply because Gates was the principal actor.

¶ 68 We find Gates's counsel erred when the trial court asked whether imposing the firearm enhancement was mandatory as applied to Gates—counsel failed to argue that the minimum sentence was unconstitutional as to Gates. And counsel erred by failing to research the applicability of the firearm enhancements to those barely over 18. Counsel further erred by failing to highlight or ask the court to consider the movement toward considering the diminished culpability of

emerging adults—which was briefly mentioned during mitigation arguments. Both failures fall below the professional standard, which suffices to satisfy the first prong of deficiency. See *People v. Nicholson*, 2021 IL App (3d) 180010 (deficiency found in unawareness of application of sentencing statutes to client).

¶ 69        Regarding the second prong, establishing prejudice does not require certainty but a "reasonable probability." *People v. Lewis*, 2022 IL 126705, ¶ 46. These arguments, including the reconsideration of applying the firearm enhancement, might have lowered the length of the sentence. A careful consideration of the record indicates that the trial court wanted to hear defense counsel argue for the discretionary imposition of the firearm enhancement. In addition, although there was consideration of mitigating factors, the primary factor missing in that analysis was emerging adults' developing brains, their similarities to juveniles, and their possibility for rehabilitation. Had counsel attempted to present these arguments to support a lesser sentence, we find a reasonable probability the court would have imposed a lower sentence.

¶ 70        Our supreme court has determined that a 40-year sentence for a juvenile was a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 41-42. Thus, based on the legislature's view of persons under 21 as minors for treatment in the juvenile system, Gates's status as an emerging adult should have been argued and considered at his sentencing. Under *Buffer*, Gates's sentence of 48 years would amount to a *de facto* life sentence and violates the proportionate penalties clause. See Ill. Const. 1970, art I, § 11; *Buffer*, 2019 IL 122327. Although Gates could be *eligible* for parole after serving 20 years (see 730 ILCS 5/5-4.5-115(b) (West 2020)), we find that the possibility for parole does not preclude Gates from serving a *de facto* life sentence, and so his 48-year sentence amounts to a *de facto* life sentence.

¶ 71    One final observation. This court recently found the minimum aggregate penalty for a first degree murder committed with a firearm constitutes a *de facto* life sentence. *People v. Leanos*, 2023 IL App (1st) 191079. "[A] mandatory minimum sentence that amounts to a *de facto* life sentence is a mandatory (*de facto*) life sentence." *Id.* ¶ 128. The *Leanos* court noted that the defense counsel never mentioned the proportionate penalties clause or asked for a sentence below the statutory minimum based on defendant's youthful traits. *Id.* ¶ 136. Instead, counsel asked five times for the minimum sentence allowed by law. *Id.* Counsel never suggested that the law gave the court discretion to impose a sentence below the statutory minimum. *Id.*

¶ 72    While expressing no view on the substantive merit of the argument, *Leanos* held the defendant's claim was "legally viable" and that "properly raised, in the right forum, the claim does demand to be heard." *Id.* ¶ 128-29. In a footnote, the dissent asserts *Leanos* is inapplicable. *Infra* ¶ 78 n.1. Although the underlying facts are dissimilar, the *Leanos* court recognized a proportionate penalties claim is viable under the right circumstances.

¶ 73    The Illinois Constitution of 1970 proportionate penalties clause requires courts to determine all penalties based on the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. We find that the possibility for parole does not preclude Gates from serving a *de facto* life sentence. Therefore, Gates's 48-year sentence amounts to a *de facto* life sentence.

¶ 74    Affirmed in part and vacated in part.

¶ 75    Cause remanded.

¶ 76    JUSTICE COGHLAN, concurring in part and dissenting in part:

¶ 77 I agree that defendant's constitutional and statutory speedy trial rights were not violated in this case. I respectfully disagree with the majority's determination that the trial court imposed a *de facto* life sentence under *People v. Buffer*, 2019 IL 122327. *Supra* ¶¶ 34, 70.

¶ 78 Defendant was sentenced to 23 years for murder plus a mandatory firearm enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)). Since he was "under 21 years of age at the time of the commission of first degree murder" and was "sentenced on or after June 1, 2019," defendant will be "eligible for parole review by the Parole Review Board after serving 20 years" of his sentence.[1] 730 ILCS 5/5-4.5-115(b) (West 2020).

¶ 79 In *People v. Dorsey*, 2021 IL 123010, ¶¶ 53-54, our supreme court equated parole with good conduct credit in that, under either, "it is in a defendant's power to shorten his sentence." The majority declares *Dorsey* "inapplicable" because the court focused on "the ' "power" ' that inmates have to shorten their sentence because their behavior, not a subjective board determination, determines whether a day is counted towards their sentence." *Supra* ¶ 41. On the contrary, in *Dorsey*, our supreme court "flatly reject[ed]" the notion that "good-conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation." *Dorsey*, 2021 IL 123010, ¶ 53.

¶ 80 Pursuant to section 5-4.5-115(b) of the Unified Code of Corrections, if a defendant is eligible for parole review after serving 20 years in prison, his sentence is not a *de facto* life

---

[1]Relying on *People v. Leanos*, 2023 IL App (1st) 191079, the majority asserts that "[t]his court recently found the minimum aggregate penalty for a first degree murder committed with a firearm constitutes a *de facto* life sentence." *Supra* ¶ 71. The defendant in *Leanos* was not sentenced "on or after June 1, 2019," and will not be eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2020). In this case, *Leanos* "does not apply to [defendant's] specific facts and circumstances, as he is not subject to a *de facto* life without the possibility of parole sentence." See *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56.

sentence. See, *e.g.*, *People v. Peter*, 43 Ill. App. 3d 1068, 1071 (1976) (finding that "[a]mong the factors that may be considered in determining whether a sentence is excessive is the defendant's eligibility for parole"). In *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56, we held that a 20-year-old sentenced to a 70-year prison term did not receive a *de facto* life sentence because he was eligible for parole after serving 20 years in prison. Relying on *Dorsey*, 2021 IL 123010, and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), we explained that "courts look to the earliest opportunity for release to assess whether a *de facto* life sentence has been imposed" and "consideration for parole remedies any *Miller* violation." *Elliott*, 2022 IL App (1st) 192294, ¶ 56. We also noted that the legislature's enactment of section 5-4.5-115(b) of the Unified Code of Corrections "seems to have been a remedial response to the constitutional issues recognized in *Miller* for both juveniles and young adults." *Id.*

¶ 81     In *People v. Cavazos*, 2023 IL App (2d) 220066, ¶¶ 50, 53, the Second District looked to comments made by Senator Harmon during the legislative floor debate prior to enacting the new parole statute in evaluating whether the statute offered a "*meaningful* opportunity for release." (Emphasis in original.). Following debate, and before the bill passed, Senator Harmon noted the " 'science of brain development' " and remarked:

> " '[T]here is no judge on the planet who can look at a nineteen-year-old and say, I know for a fact that you're the kind of young person who is going to mature and rehabilitate in prison or you're the kind who is never going to get out of prison. That's why we create this parole process, so that *** down the road, we can have a second look at the offender and say whether or not it's appropriate for them to be released.' " *Id.* ¶ 53 (quoting 100th Ill. Gen. Assem., Senate Proceedings, May 31, 2017, at 35-36 (statements of Senator Harmon)).

¶ 82        The *Cavazos* court concluded, "It is clear that the legislature, fully aware of *Miller* and the relevant considerations considering juvenile sentencing and fully within its exclusive authority, created the new parole statute and modified the parole review factors for the purpose of creating a meaningful opportunity for parole for juvenile offenders." *Id.* ¶ 54. Lest there be any misunderstanding, the court unequivocally determined that "the new parole statute *affords defendant a meaningful opportunity for release, based on his maturity and rehabilitation*, before serving a *de facto* life sentence of over 40 years' imprisonment." (Emphasis added.) *Id.* ¶ 60.

¶ 83        At the sentencing hearing in this case, the trial court properly considered that *Dorsey* "talks about the eligibility for parole" and the fact that defendant would be eligible for parole in 20 years under section 5-4.5-115(b) of the Unified Code of Corrections. The trial court also acknowledged the legislature's "remedial response" in passing section 5-4.5-115(b), stating, "And to throw everything on top of this is the recent change in law with regard to eligibility for parole for an individual under the age of 21 that committed the offense of first degree murder. That is 20 years." The court continued:

> "I believe it is the *Dorsey* case that was decided earlier this year, that it is the eligibility for parole that is determinative as to whether or not something is a *de facto* life, not the actual parole date. So any way you look at it, the defendant is eligible for parole within 20 years."

¶ 84        The record establishes that the trial court understood and complied with existing Illinois law in imposing an appropriate sentence within the lower end of the statutory range.

¶ 85        Regarding defendant's ineffectiveness claim, it is well established that effective assistance of counsel requires competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Regarding the first *Strickland* prong, there is a strong presumption that " 'the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence.' "

*People v. Crawford*, 2013 IL App (1st) 100310, ¶ 130 (quoting *People v. Coleman*, 183 Ill. 2d 366, 397 (1998)). To meet the second prong, the defendant must show a reasonable probability, *i.e.*, " 'a probability sufficient to undermine confidence in the outcome,' " that, but for defense counsel's unprofessional errors, the result of the trial would have been different. *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Defendant is unable to meet his burden under either prong of ineffective assistance under *Strickland*, 466 U.S. at 687, 694.

¶ 86    The majority deems defense counsel's performance deficient because he failed to "argue that the minimum sentence was unconstitutional as to Gates," failed to "research the applicability of the firearm enhancements to those barely over 18," and failed to "highlight or ask the court to consider the movement toward considering the diminished culpability of emerging adults." *Supra* ¶ 68. As the author of the majority opinion in this case recognized in *People v. Mobley*, 2022 IL App (1st) 201255-U, "[c]ritical is the record, and the record here does not support the majority's conclusion." *Id.* ¶ 44 (Hyman, J., dissenting).

¶ 87    Defense counsel's sentencing memorandum highlighted defendant's tumultuous upbringing, which was marred by trauma, poverty, and violence; emphasized that this case was "his first adult arrest"; and thoroughly addressed "Gates's status as an emerging adult" as follows:

"*Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny of cases have discussed at length the way in which youth of a certain age are categorically less culpable given, among other things, their immaturity, impetuosity, and failure to appreciate risks and consequences. Although Quinton was 18 at the time of incident, and thus properly charged as an adult, he had only been 18 for two months. He falls into the category of 'emerging youth' [*sic*] who, arguably, should be given similar considerations to juvenile offenders. It is thus proper for this court to take into consideration Quinton's age and immaturity as factors in mitigation.

There is no evidence to suggest that Quinton is either permanently incorrigible nor unable to be rehabilitated. To the contrary, his age and all of the attendant circumstances suggest that Quinton can go on to be a productive member of society and should be sentenced to the minimum sentence allowable."

¶ 88    At the sentencing hearing, defense counsel urged the court to consider the trend of emerging adult status, including defendant's "age, his immaturity, all of those attendant factors, and to sentence him to the minimum." Counsel argued that defendant "was only two months after his eighteenth birthday" when this crime was committed. In response to the trial court's inquiry about defendant's parole eligibility, counsel advised the court that "becoming eligible [for parole] isn't a guarantee" and repeatedly asked the court to consider the *Miller* factors "because it is so close in time to when [defendant] was a juvenile."

¶ 89    Regarding the mandatory firearm enhancement, defense counsel acknowledged that the court was bound by "what the statute says." Nevertheless, counsel vigorously argued that "the trend in the law has been to move away from mandatory minimums when it comes to juvenile offenders and to allow judges more discretion," that "any ambiguity" in the statute "must be resolved in [defendant's] favor," and that "caselaw involving *Miller* and *Buffer* the progeny of cases that have come after" recognize that "juveniles are simply different." Counsel also argued: "It is hard to say that you can go from having all those factors make such a big difference to suddenly those factors making no difference in a matter of eight weeks, which is the time span *** that [defendant] was over 18."

¶ 90    The record confirms that defense counsel's highly competent performance in this case far exceeded the "reasonably effective assistance" constitutional standard for legal representation. *Strickland*, 466 U.S. at 687-88. While begrudgingly admitting that counsel "briefly mentioned"

the diminished culpability of emerging adults at the sentencing hearing, the majority blindly insists that "Gates's status as an emerging adult *should* have been argued and considered at his sentencing." (Emphasis added.). *Supra* ¶ 70. At the risk of repeating myself, I must again emphasize that the record overwhelmingly establishes that Gates's status as an emerging adult was extensively argued and considered at his sentencing hearing.

¶ 91        In order to justify finding prejudice where none exists, the majority speculates that the trial court "might have lowered the length of the sentence" had defense counsel argued for a reconsideration of the application of the firearm enhancement. *Supra* ¶ 69. In the words of our supreme court, "under no circumstances can conjecture constitute the sole basis for a claim of prejudice." *People v. Hannon*, 48 Ill. 2d 462, 466 (1971). It is well established that "[c]onduct of a lawyer will not be deemed deficient for his or her failure to make an argument that has no basis in the law." *People v. King*, 192 Ill. 2d 189, 197 (2000); see also *People v. Hobley*, 159 Ill. 2d 272, 305 (1994) ("An attorney's conduct does not fall below the range of 'reasonable professional assistance' under *Strickland* [citation] by failing to make an argument that has no legal basis.").

¶ 92        Considering the state of the law at the time of defendant's sentencing hearing, defense counsel did not render constitutionally deficient assistance in failing to argue that the imposition of the 25-year firearm enhancement was discretionary for an adult offender or that a sentence in which defendant was eligible for parole after serving 20 years in prison was a *de facto* life term. " 'Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to accurately predict that existing law will change. [Citation.]' " *People v. English*, 2013 IL 112890, ¶ 34.

¶ 93        Our supreme court's decision in *Dorsey*, which was filed on July 29, 2021, was the law prevailing on the date of defendant's sentencing hearing. *Dorsey*, 2021 IL 123010, ¶¶ 50-51. As

the author of the majority in this case recognized in *People v. Brakes*, 2021 IL App (1st) 181737, "*Dorsey* reaffirms the principle that the relevant sentencing scheme need only provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation *before he spends more than 40 years in prison*.' *** Nothing requires the General Assembly to guarantee an opportunity for release before 40 years." (Emphasis in original.) *Id.* ¶ 4; see also *People v. Beck*, 2021 IL App (5th) 200252, ¶ 22 ("While release is not promised, the opportunity for parole provides a meaningful opportunity for release."). And as noted herein, in *Elliott*, this court held that a sentence in which an offender is eligible for parole after 40 or fewer years is not a *de facto* life sentence. *Elliott*, 2022 IL App (1st) 192294, ¶ 56.

¶ 94    Based on the law prevailing at the time of defendant's sentencing hearing and existing Illinois law, counsel's performance was not constitutionally deficient. Concluding otherwise violates this court's obligation "to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time." (Internal quotation marks omitted.) *People v. Massey*, 2019 IL App (1st) 162407, ¶ 25.

¶ 95    Contrary to the majority's conclusion, defense counsel's performance did not "fall below the professional standard" (*supra* ¶ 68) for failing to anticipate that a divided panel of this court would find the *Elliott* court's determination that parole provides a meaningful opportunity for release "seriously flawed." *Supra* ¶ 44. Our supreme court's analysis in *Dorsey*, this court's analysis in *Elliott*, and the record do not support the decision reached by my colleagues.

¶ 96    For the reasons stated herein, I would affirm defendant's conviction and sentence. I dissent from the majority's decision to remand for a new sentencing hearing.

---

***People v. Gates***, 2023 IL App (1st) 211422

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-09924; the Hon. Charles P. Burns, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Peter Sgro, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Gerrard R. Burch Jr., Assistant State's Attorneys, of counsel), for the People. |

---