2024 IL App (1st) 220470-U

No. 1-22-0470

Order filed March 15, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| v. | ) | No. 06 CR 12064 |
| EFREN AGUILAR, | ) | Honorable Angela Munari Petrone, Judge, Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mikva and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Defendant's 50-year sentence imposed at the resentencing hearing does not violate either the eighth amendment of the United States Constitution or the proportionate penalties clause of the Illinois Constitution. The sentencing court did not abuse its discretion when it resentenced him to 50 years in prison; affirmed.

¶ 2      This appeal comes before this court following a resentencing hearing for defendant, Efren Aguilar, who was 17 years old when he committed the offense of first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)). In 2019, this court reversed the trial court's dismissal of Aguilar's postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2018)), and remanded for resentencing because the trial court did not consider Aguilar's

youth and factors, as set forth in *Miller v. Alabama*, 567 U.S. 460 (2012), when it sentenced him to 50 years in prison. *People v. Aguilar,* 2019 IL App (1st) 160224-U, ¶¶ 2, 28. On remand, the sentencing court resentenced Aguilar to 50 years in prison, which included 25 years for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2022)) and 25 years for personally discharging the firearm that caused the victim's death (730 ILCS 5/5-8-1(d)(iii) (West 2022); (730 ILCS 5/5-4.5-105(b) (West 2022)).

¶ 3        Aguilar contends on appeal that his 50-year sentence violates the eighth amendment to the United States Constitution (U.S. Const., amends. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11). He argues that the sentencing court imposed the sentence without making the finding that he was permanently incorrigible and after finding that he was "not permanently incorrigible." He asserts that Illinois's strict parole limitations for juvenile homicide offenders does not provide a meaningful opportunity for release, and the sentencing court's findings were incompatible with and contradicted *Miller's* findings regarding the characteristics of juvenile offenders. He also argues his sentence is excessive and the court overlooked and misconstrued critical mitigation.

¶ 4                                I. BACKGROUND

¶ 5        Following a 2007 jury trial, Aguilar was found guilty of first degree murder in the shooting death of Brandon McClelland that occurred on May 29, 2004, when Aguilar was 17 years old. The trial evidence is not at issue here, so we briefly summarize and repeat the trial evidence that was set forth in this court's prior orders. See *People v. Aguilar*, 396 Ill. App. 3d 43 (2009); *People v. Aguilar*, 2012 IL App (1st) 110878-U; *People v. Aguilar,* 2019 IL App (1st) 160224-U.

¶ 6        On May 29, 2004, at about 10:30 p.m., Brandon McClelland, who was 18 years old, was with his three friends at a park in Chicago. Aguilar rode up to them on a bike and asked them

a question about what gang they were in and some of them responded that they were not in a gang. Aguilar then pulled out a gun and started shooting. A bullet struck McClelland in his back, and he later died in the hospital. Two of the victim's friends who were in the park that night identified Aguilar in a photo lineup as the shooter. The third friend also identified Aguilar in a photo lineup as the shooter but stated he would need to see him in person to be sure. See *Aguilar*, 396 Ill. App. 3d at 44-45; *Aguilar*, 2012 IL App (1st) 110878-U, ¶ 3.

¶ 7        About two years later, Aguilar was arrested following a traffic stop. During the stop, Aguilar did not give the police officers his correct name and one of the officers saw a gun on the floor by the passenger's side of his car. Aguilar drove away until his car ran into a railroad embankment. Aguilar then ran into the railroad yard, and one of the officers testified that when Aguilar was running, he turned around and pointed a gun at the officer, after which the officer fired one shot in his direction. Aguilar continued to run, and at one point, the officer lost sight of him. Later during the chase, the officer fired his gun a second time. Aguilar was eventually taken into custody, and no handgun was found on him. See *Aguilar*, 396 Ill. App. 3d 43 at 45; *Aguilar*, 2012 IL App (1st) 110878-U, ¶ 3.

¶ 8        The jury found Aguilar guilty of first degree murder and the trial court subsequently sentenced him to 25 years for first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) and 25 years for using a firearm during the offense, for a total of 50 years in prison. On direct appeal, this court affirmed the trial court's judgment. *Aguilar*, 396 Ill. App. 3d at 44.

¶ 9                           Post-Conviction Proceedings

¶ 10        In 2010, Aguilar filed a postconviction petition, in which he argued, among other things, that his trial counsel was ineffective for failing to present alibi witnesses who would have testified that he was not present in the park on the night of the incident. Aguilar attached affidavits

to support his petition, including an affidavit from Priscila Pernillo, who was Aguilar's girlfriend at the time. She averred that on the night of the incident, she and Aguilar were together with their friends in Sauk Village, Illinois, not in the park when the shooting occurred. The trial court summarily dismissed Aguilar's petition. On appeal, this court reversed the trial court's dismissal and remanded for further proceedings. *Aguilar*, 2012 IL App (1st) 110878-U.

¶ 11 On remand, Aguilar filed a supplemental postconviction petition, in which he argued that his 50-year sentence for an offense he committed when he was 17 years old was an unconstitutional *de facto* life sentence under *Miller*. He contended that his sentence violated the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. He also argued that trial counsel was ineffective for failing to argue at the sentencing hearing that the court should consider Aguilar's youth when it sentenced him, and that appellate counsel was ineffective for failing to raise the issue on appeal. The State moved to dismiss Aguilar's postconviction petition, arguing, among other things, that his sentencing claim was not affected by *Miller*, and that Pernillo stated in a videotaped statement that her affidavit was false, and that Aguilar and his mother urged her to sign it.

¶ 12 At an evidentiary hearing on Aguilar's initial and supplemental postconviction petition, the court admitted into evidence Pernillo's deposition, in which she recanted her alibi statement contained in her affidavit. Aguilar's postconviction counsel who prepared the initial petition testified at the hearing that in October 2010, she met with Pernillo and Aguilar's mother, at which time Pernillo told her the information that she included in the affidavit. Pernillo never told counsel the information was not true or that she had been coerced by anyone. Following the hearing, the trial court granted the State's motion to dismiss Aguilar's postconviction petition.

¶ 13    On appeal, this court reversed the trial court's dismissal of Aguilar's sentencing claim and remanded for further proceedings, concluding that his 50-year sentence violated the eighth amendment to the United States Constitution. *Aguilar,* 2019 IL App (1st) 160224-U, ¶ 28. In doing so, this court stated that Aguilar received a *de facto* life sentence and that the record did not indicate that the trial court considered his youth and attendant circumstances or that it discussed the factors set forth under *Miller* when it sentenced him. *Id.* ¶ 27. This court vacated Aguilar's sentence and remanded for resentencing under section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105) (West 2018)), which requires the trial court "to consider a number of factors when imposing a sentence on an individual under the age of 18." *Id.* ¶¶ 26-27. This court affirmed the summary dismissal in all other respects. *Id.* ¶ 4.

¶ 14                        Resentencing Hearing on Remand

¶ 15                            Aggravation Evidence

¶ 16    At the resentencing hearing, the State requested the sentencing court take judicial notice of the common law record, the transcripts from the trial and postconviction proceedings, the trial exhibits, Pernillo's evidence deposition entered into evidence at the postconviction hearing, and the original presentence investigation report (PSI) from Aguilar's sentencing hearing in 2007. The PSI provided information on Aguilar's social history, education, employment, health, alcohol and drug use, community involvement, and economic status. The State also asked the court to admit into evidence Aguilar's records from the Illinois Department of Corrections (IDOC), which included disciplinary and rehabilitation records, as well as his delinquency records from juvenile court. The State requested the court consider five victim impact statements and then it presented three witnesses, including the victim's mother and two younger sisters, who each read their victim impact statements.

¶ 17                                   Mitigation Evidence

¶ 18     Defense counsel presented a defense mitigation report prepared by Helen Kim Skinner, JD, MSW, a mitigation specialist. The report explained the history of abuse Aguilar experienced from his father, and the "lack of action" from his mother. The report also explained Aguilar's early exposure to violence in his neighborhood and gangs and that he "was longing for a sense of identity," which he found when he was recruited by the Latin Kings gang.

¶ 19     The report also provided information on Aguilar's aggravated criminal sexual assault finding of delinquency that is listed in the PSI. The report further stated that Aguilar was traumatized by his time in the Juvenile Temporary Detention Center and started to "turn to individuals outside his family for the feelings of love and protection." He started to skip school to "escape humiliation," was "harder, angrier, less emotional," and started spending time with an adult neighbor who taught him how to sell drugs. Members of the gang noticed that he could sell "drugs quickly" and "promised him that he could make more money if he were to join their gang." Aguilar used his money from selling drugs to support his family. Aguilar "felt a constant tension between knowing that what he was doing in a gang and selling drugs was wrong, yet he felt 'so heavily invested so there was no turning back.' "

¶ 20     The report also stated that Aguilar attempted "to get into programming" while in the IDOC, but it was unavailable "to inmates without close release dates; those with the equivalent of a life sentence will not receive 'rehabilitation' services." The report concluded that when Aguilar committed the offense, he was "in the height of taking risks as a normal part of adolescent development" and he has "tremendous remorse and regret" about what he did.

¶ 21     Defense counsel presented letters in support for Aguilar from officers from the Cook County Jail and the IDOC. Defense counsel also presented nine certificates from certain programs

in which Augilar was involved while in custody as well as the 2022 PSI report, which contained information on his social history, education and employment, family and social support, housing and neighborhood history, peer associations, health, substance abuse, and attitudes and behavioral patterns. Griselda Magallanes testified as a witness for Aguilar.

¶ 22                                    Arguments

¶ 23       In aggravation, the State summarized the facts of the offense and case, including that two years after the shooting, he fled from the police during a traffic stop. The State directed the court to Aguilar's IDOC records which reflected that from 2008 to 2018, he had 17 major discipline violations. The State summarized some of the violations, including one in 2017 where guards fired two warnings shots to stop an altercation in which he was involved.

¶ 24       The State asserted that Aguilar had been involved with the Latin Kings gang since 2005 and that, although he had indicated in his original PSI that he no longer had an affiliation, the IDOC records indicated that he continued an affiliation. The State argued that during postconviction proceedings, Pernillo testified that Aguilar pressured her to sign the false affidavit regarding the alibi. The State explained that the 25-year firearm enhancement was now discretionary and not mandatory as it was at the original sentencing.

¶ 25       In mitigation, defense counsel directed the court to the defense mitigation packet and argued that Aguilar had a "complex relationship" with his father, who was domineering, cold, and abusive. Counsel stated that Aguilar's mother was not able to protect him at that time and, as he got older, Aguilar began to fight with his father in response to the abuse. Counsel explained that Aguilar was initially driven to gang involvement due to the violence and lack of attentiveness from his father and that he started selling drugs to support his family. Counsel explained that after Aguilar was arrested, his daughter was born, who was a source of hope for him and leading to his

rehabilitation. Counsel stated that Aguilar received certificates from various programs in the Cook County jail, where he had been living since the case was remanded, which showed an increase in his maturity. Following counsel's argument, Aguilar addressed the court.

¶ 26                    Sentencing Court's Resentencing Order

¶ 27        On March 28, 2022, the sentencing court issued a written resentencing order, in which it sentenced Aguilar to 25 years in prison for first degree murder, plus an additional 25 years for the firearm enhancement, for a total of 50 years in prison. The court provided a summary of the offense and proceedings in the case. It also stated it reviewed the common law record, the transcripts from trial, prior filings, the appellate court decisions, Pernillo's deposition, the records from the IDOC and juvenile court, the PSI, the defense mitigation packet, Aguilar's statement in allocution, the victim impact statements, the testimony and arguments from the resentencing hearing, and the law that applies to sentencing individuals who commit an offense when they are under the age of 18.

¶ 28        The court then provided summaries of the PSI, the IDOC records, the defense mitigation report, Aguilar's statement in allocution, and the testimony at the resentencing hearing. As for the IDOC records, the court stated that they showed that for the 12-year period when Aguilar was in the IDOC, he attended one 6-week course for "Lifestyle Redirection" in April 2015, and he was enrolled in class to get his GED. The court noted that the IDOC records also showed that Aguilar was often kept in maximum security status and that he continued to participate in gang activity, possessed unauthorized property, disobeyed direct orders, participated in beatings of other inmates, and participated in a major altercation where warning shots were fired.

¶ 29        The court noted that the defense mitigation report stated that since Aguilar was remanded to the Cook County jail, he earned certificates in a number of programs, including a

8

course in men's health, the Second Chance Program, Mindfulness for Beginners training, writing workshops, and Introduction to Chicago History. The court explained that he passed the constitutional exam, advanced in the PACE Institute, which was a prerequisite to a GED, and his average grade with the Stratford Career Institute was 92%. The court noted that a letter from a correctional officer from the Cook County jail stated that Aguilar never received a disciplinary write-up upon his return to the jail and he helped "keep peace among other detainees" and a letter from an IDOC officer that spoke positively of Aguilar's time in the Menard Correctional Center. The court noted that in Aguilar's statement in allocution, he expressed remorse for his actions and stated that he wanted to get his GED and to be a good father.

¶ 30        The court explained that the sentencing range for first degree murder was 20 and 60 years (730 ILCS 5/5-4.5-20(a) (West 2022)) and that the court had discretion to impose the firearm enhancement (730 ILCS 5/5-4.5-105(b) (West 2022)). The court cited the factors under section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2022)) that it must consider when sentencing an individual who commits an offense while under the age of 18. The court also cited section 5-4.5-115(b) (730 ILCS 5/5-4.5-115(b) (West 2022)) of the Code, the statute governing parole for individuals who commit an offense under the age of 21, and it provided a summary of the evolving law on juvenile sentencing, including summaries of *Miller*, *People v. Holman*, 2017 IL 120655, *People v. Buffer*, 2019 IL 122327, *People v. Dorsey*, 2021 IL 123010, and *Jones v. Mississippi*, 593 U.S.__, __, 141 S. Ct. 1307 (2021).

¶ 31        The court then concluded that Aguilar was 17 years old when he shot and killed the victim and that it was "not an impetuous act." It reasoned that Aguilar was "riding around a park on a bike with a loaded gun," he acted alone, he "boldly and purposefully approached" a group of four young men and asked them about gang affiliation, and the four men did not provoke him. The

9

court stated that there was "no outside pressure from anyone, no peer or family pressure, no egging [Aguilar] on to fire his gun multiple times at people who were running away from him." The court stated that there was no evidence Aguilar had a cognitive or developmental disability when he acted.

¶ 32    The court stated that Aguilar provided conflicting information about his family relationships, gang involvement, rehabilitative potential, and his use of substances. As for his family relationships, the court stated that, "[a]t one point, he did not feel loved, even by his mother" and "[a]t another, he was 'very satisfied' with the 'strong support' he was getting from his family." The court further stated that at one point, Aguilar's father physically abused him "so often that he frequently ran away from home" and that, at another, his father also worked hard every day as a laborer to support the family. The court noted that the Department of Children and Family Services was never involved with his family and that, after his parents divorced, Aguilar claimed he gave the money he earned selling drugs to his mother. The court stated that the IDOC records showed that Aguilar's family members frequently visited him.

¶ 33    As for the conflicting information about Aguilar's gang involvement, the court stated that, "[a]t one point, he joined the gang because it was like a family and gave him love and protection he did not feel at home" and, at another time, "he was so adept at drug sales, which he began of his own volition, that the gang took notice of him and recruited him to be a member." The court noted that while awaiting sentencing, Aguilar stated that he had realized "the gang was just using him, and he was trying to avoid physical confrontations/fights" but the IDOC records were "replete with [Aguilar's] continued gang involvement, fighting and beating of other inmates, while an adult, which this court considers aggravation."

¶ 34    With respect to the court's finding that Aguilar demonstrated conflicting information about his rehabilitative potential, the court explained that while awaiting sentencing, he expressed remorse and that he wanted to obtain a GED, attend rehabilitative programs, and be a better father to his daughter. The court stated that in the 12 years while in the IDOC, Aguilar did not obtain his GED and he received only one certificate. The court stated that after this case was remanded for resentencing, Aguilar earned several certificates and scored an average of 92% in high school classes. The court noted that in the statement Aguilar read in court, he had the same goals in that he wanted to get a GED, learn a trade, and be a better father. As for the court's finding that Aguilar provided conflicting information about his use of substances, the court noted that Aguilar stated he " 'did not have any issues with alcohol or drugs' " and that, at another time, he admitted he had a problem with alcohol.

¶ 35    The court also stated that it considered Aguilar's attempt to get Pernillo, the mother of his child, to lie for him in an affidavit during the postconviction proceedings as an aggravating factor. The court explained that it found Aguilar's action of fleeing from the police and pointing a gun at the officer chasing him was also an aggravating factor.

¶ 36    The court found that Aguilar's youthful age of 17 years old and attendant immaturity was mitigating. It concluded that Aguilar has "potential for rehabilitation, as evidenced by certificates he earned and grades he received in school since the new sentencing hearing was ordered." The court stated: "He was capable of helping keep peace in the jail upon his remand. He attended church in prison. He does not show irreparable depravity or permanent incorrigibility."

¶ 37    The court found that in determining whether Aguilar's sentence of 50 years is constitutional, the court may consider section 5-4.5-115(b) of the Code (730 ILCS 5/5-4.5-115(b) (West 2022)), which permits the Prisoner Review Board (Board) to release a juvenile offender

after 20 years, and when making that determination, the Board must "consider the diminished culpability of youthful offenders, hallmark features of youth, and any subsequent growth and maturity of a youthful offender during incarceration." The court then concluded that the requirements of *Miller* were satisfied, and that Aguilar was sentenced to a "discretionary *de facto* life sentence and has the possibility of release after serving 20 years, upon the showing of his growth and maturity during incarceration." The court further concluded:

> "Although [Aguilar] is not permanently incorrigible, this court finds that such showing of growth and maturity during incarceration has not been made in this case so far, based on all of the above. This court is not mandated to disregard the minimum sentencing enhancement imposed, or to give [Aguilar's] expression of remorse and some amount of rehabilitative potential more weight than the seriousness of the offense and all the aggravation noted above. [Aguilar] has a chance to prepare himself for the outside world. He can learn a trade in prison, or get the GED he has said since 2007 that he wants to get, and continue further schooling. He can stop his gang activities, violent behavior and pummeling over inmates."

¶ 38 Aguilar filed a motion to reconsider sentence, in which he argued, among other things, that his sentence was excessive in light of the mitigation evidence presented, his sentence failed to satisfy this court's prior order mandating that he receive a sentence that did not violate the eighth amendment, and his sentence violated the proportionate penalties clause of the Illinois Constitution. The court denied the motion to reconsider sentence. This appeal follows.

¶ 39                                        II. ANALYSIS

¶ 40 Aguilar contends that his 50-year sentence is a *de facto* life sentence and violates the eighth amendment to the United States Constitution and the proportionate penalties clause of the

12

Illinois Constitution. He asserts the sentencing court imposed the *de facto* life sentence without making a finding that he was permanently incorrigible and after making the express finding that he was "not permanently incorrigible."

¶ 41                                      Eighth Amendment

¶ 42       The United States Supreme Court concluded in *Miller* that a sentence of mandatory life in prison without parole for an individual who was under the age of 18 years when the offense was committed violates the eighth amendment's prohibition on " 'cruel and unusual punishments' ." *Miller*, 567 U.S. at 465. The court reasoned that a mandatory sentencing scheme prevents a court from considering a juvenile offender's "age and the wealth of characteristics attendant to it," including "immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 465, 471, 476-77. The court explained that "children are constitutionally different from adults for purposes of sentencing" and are " 'less deserving of the most severe punishments,' " as they "have diminished culpability and greater prospects for reform." *Id.* at 471 (quoting *Graham v. Florida,* 560 U.S. 48, 68 (2010)). Under *Miller*, "sentences must be based on a process employing judicial discretion rather than statutory mandates" and "sentencing courts must take into account how an offender's youth and attendant circumstances 'counsel against irrevocably sentencing them to a lifetime in prison.' " *People v. Wilson*, 2023 IL 127666, ¶ 27 (quoting *Miller*, 567 U.S. at 480). Later, in *Montgomery v. Louisiana*, the court stated that under *Miller*, a life sentence without parole is barred "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility" and "those rare children whose crimes reflect irreparable corruption." 577 U.S. 190, 209-10 (2016); *Wilson*, 2023 IL 127666, ¶ 28. Then, in *Jones v. Mississippi*, the United States Supreme Court explained that, before a sentencing court imposes a life sentence without parole,

13

*Miller* does not require a sentencing court "to make a separate finding of permanent incorrigibility." 593 U.S. at __, 141 S. Ct. at 1316 .

¶ 43　　Illinois codified the factors set forth in *Miller* in section 5-4.5-105(a) of the Code, which requires the court to consider "additional factors" in mitigation before imposing a sentence on an individual under the age of 18. *Buffer*, 2019 IL 122327, ¶ 36 (quoting 730 ILCS 5/5-4.5-105(a) (West 2016)).

¶ 44　　The Illinois Supreme Court has applied the reasoning of *Miller* to apply to mandatory *de facto* life sentences. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10. "A *de facto* life sentence is a term of years that is functionally equivalent to natural life without the possibility of parole." *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 53 (citing *Reyes*, 2016 IL 119271, ¶ 9). A *de facto* life sentence has been defined as a sentence of 40 years or more. *Buffer*, 2019 IL 122327, ¶¶ 40-41.

¶ 45　　In *People v. Holman*, 2017 IL 120655, ¶¶ 40, 46, our supreme court concluded that *Miller* also applied to discretionary, as well as mandatory, life sentences, and that, under *Miller* and *Montgomery*, a juvenile offender may be sentenced to life in prison under a discretionary sentencing scheme only "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." However, after Aguilar filed his opening brief in this case, our supreme court issued *Wilson*, which overruled *Holman*'s conclusions that *Miller* applied to discretionary life sentences and that a trial court is required to make a separate finding of permanent incorrigibility before it sentences a juvenile to a discretionary life sentence. *Wilson*, 2023 IL 127666, ¶¶ 41-42; *People v. Morris*, 2023 IL App (1st) 220035, ¶ 3.

¶ 46　　In *Wilson*, our supreme court reasoned that *Miller* "did not categorially prohibit life sentences for juvenile offenders" but "held that such sentences must be based on a process

employing judicial discretion rather than statutory mandates and that sentencing courts must take into account how an offender's youth and attendant circumstances 'counsel against irrevocably sentencing them to a lifetime in prison.' " *Wilson*, 2023 IL 127666, ¶ 27 (quoting *Miller*, 567 U.S. at 480). The court stated that *Holman*'s holding that a sentencing court must make an additional finding that a juvenile is permanently incorrigible before it imposes a discretionary life sentence is "*directly* at odds with the holding in *Jones*—specifically, that additional findings are not required, in that a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is 'constitutionally sufficient.' " (Emphasis in original.) *Id.* ¶ 42 (quoting *Jones*, 141 S. Ct. at 1313)). This court has explained that,

> "Under *Wilson*, so long as a juvenile offender 'was sentenced under a sentencing scheme that granted the sentencing court the discretion to consider [his or her] youth and attendant circumstances and to impose less than a *de facto* life sentence,' and so long as it is also 'clear from the record that the sentencing court did not *refuse*, as a matter of law, to consider [the defendant's] youth' (emphasis added), the defendant will be found to have 'received the constitutionally required procedure under *Miller*.' " *Morris*, 2023 IL App (1st) 220035, ¶ 55 (quoting *Wilson*, 2023 IL 127666, ¶ 44).

Our review of whether a sentence violates the eighth amendment is *de novo*. *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 38, pet. for leave to appeal pending, No. 220066 (filed August 31, 2023).

¶ 47    Here, the sentencing range for first degree murder is 20 to 60 years in prison (730 ILCS 5/5-4.5-20(a)) (West 2022)) and, at the time of the resentencing hearing, the firearm enhancement was not mandatory (730 ILCS 5/5-4.5-105(b) (West 2022)). The court had the discretion to give Aguilar a minimum sentence of 20 years. See *Morris*, 2023 IL App (1st) 220035, ¶ 55 (where the

16-year-old defendant received a 100-year sentence, the court stated that because the court had the discretion to impose a sentence as low as 26 years, "it would appear after *Wilson* that no eighth amendment claim is available to him"). Further, Aguilar could have received a discretionary sentence of up to 85 years, as long as the sentencing court considered his youth and attendant circumstances. See *People v. Webster*, 2023 IL 128428, ¶ 20 (stating that the defendant "faced a *discretionary* sentence of up to 85 years in prison (20 to 60 years for first degree murder plus a 25-year firearm enhancement), so long as the trial judge considered defendant's youth and attendant circumstances.") (Emphasis in original.))

¶ 48    The record shows that the sentencing court considered Aguilar's youth when it imposed the 50-year sentence. The court issued a comprehensive written order in which it recited the factors set forth in *Miller* and the provisions in section 5-4.5-105(a) of the Code that a court must consider when sentencing a person under the age of 18. The court explained its reasoning and expressly stated that it reviewed the testimony and arguments, the PSI, and defense mitigation packet, which included information about Aguilar's childhood, adolescence, and history of traumatic experiences. The court also discussed the facts of the offense and noted Aguilar's age and his attendant immaturity and his potential for rehabilitation. See *Webster*, 2023 IL 128428, ¶ 20 (finding that the trial court considered the defendant's youth and attendant circumstances as the court "expressly noted defendant's age, lack of maturity, rehabilitative potential, and the circumstances of the murder"). Further, as previously noted, under *Wilson*, the court was not required to make the additional finding that Aguilar was permanently incorrigible before it imposed the 50-year sentence. See *Wilson*, 2023 IL 127666, ¶ 42. Accordingly, Aguilar's sentence does not violate the eighth amendment.

¶ 49 We note that *Wilson* was issued after Aguilar filed his opening brief, and in his reply brief, he asserts that *Wilson*'s holding that a sentencing court is not required to make a permanent incorrigibility finding before imposing a *de facto* life sentence does not apply here where the court made the express finding that he was "not permanently incorrigible." However, as discussed above, Aguilar's sentence was discretionary and the record shows that the sentencing court considered his youth and attendant circumstances, so his sentence does not violate *Miller*. See *Morris*, 2023 IL App (1st) 220035, ¶ 55.

¶ 50 We note that Aguilar also contends that his sentence is a *de facto* life term and implicates *Miller* and *Holman* because Illinois's parole statute for individuals under the age of 21 does not provide him a "meaningful opportunity to obtain release" based on his demonstrated maturity and rehabilitation as required by *Miller*. He asserts that the national consensus against Illinois's strict parole limitations for juvenile offenders shows that his 50-year sentence was unconstitutionally disproportionate without the finding that he was permanently incorrigible.

¶ 51 Under section 5-4.5-115(b) of the Code, a person convicted of first degree murder is eligible for parole after serving 20 years if that person was under 21 at the time of the offense and was sentenced after June 1, 2019, the effective date of the statute. 730 ILCS 5/5-4.5-115(b) (West 2022).

¶ 52 Here, the parole statute applies to Aguilar, as he was 17 years old at the time of the offense, and his sentencing occurred in March 2022 after the June 1, 2019, effective date. However, we need not address the effect that the possibility of Aguilar's parole eligibility has here because, as previously discussed, his 50-year sentence does not violate the eighth amendment, as the court had the discretion to impose less than a *de facto* life sentence, and it considered his youth and attendant circumstances when it sentenced him. See *Morris*, 2023 IL App (1st) 220035, ¶ 55

(noting that the question regarding the "impact of the availability of parole" may be moot in light of *Wilson*, which overruled *Holman*).

¶ 53                    Proportionate Penalties Clause of the Illinois Constitution

¶ 54        Aguilar contends that his 50-year sentence for an offense committed when he was 17 years old is a *de facto* life sentence and unconstitutional under the proportionate penalties clause of the Illinois Constitution. In Aguilar's opening brief, he asserts that *Holman*'s requirement that a court must make a permanent incorrigibility finding before imposing a life sentence, should also apply under the proportionate penalties clause and that his 50-year sentence violates the proportionate penalties clause because it was imposed without the sentencing court making this finding.

¶ 55        As previously discussed, in *Wilson*, which was issued after Aguilar filed his opening brief, our supreme court overruled *Holman*'s requirement that a sentencing court must make a finding that the juvenile offender is permanently incorrigible before imposing a life sentence. *Wilson*, 2023 IL 12766, ¶ 42; see *Cavazos*, 2023 IL App (2d) 220066, ¶ 64 ("Again, *Holman*'s requirement that there be a permanent incorrigibility finding has now been overruled.").

¶ 56        In Aguilar's reply brief, he argues that *Wilson* did not answer the question whether the proportionate penalties clause requires a permanent incorrigibility finding and asserts that the Illinois Constitution is more expansive than the eighth amendment. He also argues that his sentence violates the proportionate penalties clause because the court imposed a 50-year *de facto* life sentence while also making the findings that he was amendable to rehabilitation and "not permanently incorrigible."

¶ 57        Under the proportionate penalties clause, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful

18

citizenship." Ill. Const. 1970, art. 1, § 11. A sentence "violates the proportionate penalties clause if the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Ruddock,* 2022 IL App (1st) 173023, ¶ 70. Further, "[o]ur supreme court has explained that the proportionate penalties clause's unique emphasis on rehabilitative potential provides 'a limitation on penalties beyond those afforded by the eighth amendment [to the United States Constitution]' "). *Id.* ¶ 68 (quoting *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41)). Our review regarding the question of whether a sentence violates the proportionate penalties clause is *de novo*. *Cavazos*, 2023 IL App (2d) 220066, ¶ 63.

¶ 58　　　Initially, we recognize that *Wilson,* which overruled *Holman*'s finding that a court must make a permanent incorrigibility finding before imposing a life sentence, addressed the defendant's argument made under the eighth amendment and did not address his claim under the proportionate penalties clause. See *Wilson*, 2023 IL 127666, ¶ 46. We also note that in *People v. Clark*, 2023 IL 127273, ¶ 72, which involved a 24-year-old defendant, our supreme court has stated that "[t]he reasoning in *Miller* does not apply to discretionary life sentences under proportionate penalties clause standards where the circuit court does consider all relevant mitigating factors at sentencing and the circuit court's exercise of discretion is supported by the evidence in the record." Here, as previously discussed, Aguilar received a discretionary sentence, and the sentencing court considered his youth and attendant immaturity.

¶ 59　　　Nevertheless, under both the eighth amendment and the proportionate penalties clause, "a juvenile defendant must make the same threshold showing: his or her sentence is a life sentence or *de facto* life sentence." *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 42. Here, Aguilar did not receive a *de facto* life sentence.

¶ 60 To determine "whether a *de facto* life sentence has been imposed, the court must consider the defendant's 'earliest opportunity for release.' " *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 41 (quoting *Dorsey*, 2021 IL 123010, ¶ 54). Further, "[i]f a defendant has a meaningful opportunity to obtain release before serving more than 40 years in prison, he has not received a *de facto* life sentence." *Id.* The United States Supreme Court has held that "[a] State is not required to guarantee eventual freedom, but must impose a sentence that provides some meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. In *Dorsey*, our supreme court found that the day-for-day good-conduct credit statutory scheme was relevant in determining what constitutes a *de facto* life sentence. *Dorsey*, 2021 IL 123010, ¶ 38, ¶¶ 1, 54. In doing so, it explained that the good-conduct statutory scheme, "which allows for the opportunity of release short of a *de facto* life sentence, is at least on par with discretionary parole for a life sentence, which has specifically been held by the Supreme Court to pass muster under the eighth amendment." *Id.* ¶ 54 (citing *Montgomery*, 577 U.S. at 212).

¶ 61 Here, as previously discussed, under the parole statute for juvenile offenders under the age of 21, Aguilar will be eligible for parole and will have the opportunity to seek release before serving 40 years. See 730 ILCS 5/5-4.5-115(b) (West 2022). Aguilar therefore did not receive a *de facto* life sentence, and he cannot establish that his sentence violates the proportionate penalties clause. See *Elliott*, 2022 IL App (1st) 192294, ¶ 56 (concluding that the defendant's 70-year sentence was not a *de facto* life sentence since he will be eligible for parole after serving 20 years of his sentence); see also *Hill*, 2022 IL App (1st) 171739-B, ¶ 42 (concluding that the defendant was not serving a *de facto* life sentence "so neither the United States nor the Illinois Constitution has any work to do").

¶ 62      Aguilar contends however that his 50-year sentence is a *de facto* life sentence because the parole statute does not provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation that is required under *Miller*. He asserts that the parole statute's limitations for juvenile homicide offenders shows that his *de facto* life term is disproportionate without a finding that he was permanently incorrigible.

¶ 63      Aguilar argues that the parole statute does not provide a meaningful opportunity for release because Illinois's limitations fall outside of the country's evolving standard of decency. He takes issue with the parole statute's requirements that a juvenile homicide offender must serve 20 years before applying for parole, the offender must wait 10 additional years for the second review if the first attempt is denied, and, if the second attempt is denied, the offender is foreclosed from seeking review ever again. See 730 ILCS 5/5-4.5-115(b), (m) (West 2022). He also contends that the parole rules conflict with *Miller*'s findings about juvenile offenders' culpability and rehabilitative potential.

¶ 64      In *Cavazos*, the defendant was sentenced to 50 years in prison for offenses he committed when he was 17 years old, and he raised similar arguments on appeal regarding the parole statute that Aguilar raises here. 2023 IL App (2d) 220066 ¶ 50. The court concluded that the "parole statute affords defendant a meaningful opportunity for release, based on his maturity and rehabilitation, before serving a *de facto* life sentence of over 40 years." *Id.* ¶ 60. In the court's analysis, the court reviewed the legislative transcripts from the legislature floor debate that occurred before the parole statute was enacted and concluded: "It is clear that the legislature, fully aware of *Miller* and the relevant considerations concerning juvenile sentencing and fully within its exclusive authority, created the new parole statute and modified the parole review factors for the purpose of creating a meaningful opportunity for parole for juvenile offenders." *Id.* ¶ 54.

¶ 65    The court in *Cavazos* further explained that "the new parole statute *explicitly* requires the Board to consider the *concerns* implicated by *Miller* and its progeny." (Emphasis in original.) *Id.* ¶ 56. Under the parole statute, the court stated that, " 'in considering the factors affecting the release determination under 20 Ill. Adm. Code 1610.50(b), the Prisoner Review Board panel *shall consider* the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration.' " (Emphasis in original.) *Id.* ¶ 56 (quoting 730 ILCS 5/5-4.5-115(j) (West 2020)). The court further concluded:

> "[W]hen our legislature created the new parole statute, it was fully apprised of *Miller* and its mandates, as well as, presumptively, the processes used by other states. While we might be sympathetic to some of defendant's points, and hope the legislature reconsiders some parole restrictions (particularly the lengthy period between petition opportunities and foreclosure of opportunities thereafter), it the legislature's role to craft parole statutes and procedures and to determine what is meaningful. Here, it did so after due debate, much deliberation, and lengthy negotiations. It considered not only *Miller* and all of its implications, but also victims' rights, the seriousness of offenses (deliberately tailoring waiting periods for petitions based on the offense), and the proper factors to be considered within the Board's authority." *Id.* ¶ 60.

After finding that the parole statute afforded the defendant a meaningful opportunity for release before serving a *de facto* life sentence of over 40 years, the court rejected the argument that his 50-year sentence violated the proportionate penalties clause because the court failed to make a permanent incorrigibility finding. *Id.* ¶¶ 60-64. The court reasoned that the defendant did not receive a life sentence because he would be eligible for parole "before serving the equivalent of a

life sentence" and would have "two meaningful opportunities to seek release prior to serving more than 40 years" in prison. *Id.* ¶ 64.

¶ 66    Further in *Elliott*, under the defendant's proportionate penalties clause claim, this court found that the 20-year-old defendant's 70-year sentence did not implicate Miller and was not a *de facto* life sentence "since he is eligible for parole," noting that "with eligibility for parole, [the defendant] may obtain release upon demonstrated rehabilitation and maturity upon serving 40 or fewer years." 2022 IL App (1st) 192294, ¶ 56. This court further stated that "our legislature's 2019 enactment providing parole eligibility for offenders under age 21 convicted of serious crimes seems to have been a remedial response to the constitutional issues recognized in *Miller* for both juveniles and young adults." *Id.*

¶ 67    Likewise, here, we conclude that Aguilar did not receive a *de facto* life sentence because under the parole statute, he will have a reasonable opportunity for release based on his maturity and rehabilitation after serving 20 years and before serving a *de facto* life sentence of 40 years in prison. See *Cavazos*, 2023 IL App (2d) 220066 ¶¶ 60, 64 (the 17-year-old defendant's 50-year sentence was not a life sentence because he would be eligible for parole before serving the equivalent of a life sentence); *Kendrick* 2023 IL App (3d) 200127, ¶ 43 (concluding that the 19-year-old defendant's 60-year sentence was not a *de facto* life sentence and finding that he "has a reasonable opportunity to obtain release well before serving more than 40 years in prison"). Therefore, even if we assume that *Holman*'s conclusion that a sentencing court must make a permanent incorrigibility finding before imposing a life term still applied under the proportionate penalties clause, it would not apply here, as Aguilar did not receive a *de facto* life sentence. See *Cavazos*, 2023 IL App (2d) 220066 ¶ 64 (concluding that "even if, theoretically, *Holman*'s requirement for an incorrigibility finding had remained valid, and a failure to issue one might have

violated the proportionate penalties clause," there was no violation where the defendant would be "*eligible for parole* before serving the equivalent of a life sentence.") (Emphasis in original.) We therefore disagree with Aguilar's arguments that his 50-year sentence violates the proportionate penalties clause because the sentencing court imposed a *de facto* life term without making a permanently incorrigibility finding and with making the express finding that he was "not permanently incorrigible." See *id.* ¶ 64 (where the trial court did not make a permanent incorrigibility finding the defendant's 50-year sentence did not violate the proportionate penalties clause). Aguilar's parole eligibility reflects the sentencing court's findings that he is not permanently incorrigible and is amendable to rehabilitation.

¶ 68        We note that after the parties completed briefing, Aguilar cited as additional authority *People v. Gates*, 2023 IL App (1st) 211422, a recent decision by a division in this court. In *Gates*, the court found that, although the defendant, who was 18 years old at the time of the offense and sentenced to 48 years, could be eligible for parole after serving 20 years under the parole statute, "the possibility for parole does not preclude [the defendant] from serving a *de facto* life sentence." *Id.* ¶ 70. It concluded that the "parole scheme does not afford offenders like [the defendant] access to the courts or a meaningful opportunity for release and cannot be used to remedy a *de facto* life sentence that violates the proportionate penalties clause." *Id.* ¶¶ 36-49. In doing so, the court found that our supreme court's decision in *Dorsey*, which held that good-conduct credit is relevant to the determining of what constitutes a *de facto* life sentence for a juvenile offender (*Dorsey*, 2021 IL 123010, ¶ 1), was inapplicable. *Gates*, 2023 IL App (1st) 211422, ¶ 41. It noted that *Dorsey* "focused on the 'power' that inmates have to shorten their sentence because their behavior, not a subjective board determination, determines whether a day is counted towards sentence." *Id.* (citing *Dorsey*, 2021 IL 123010, ¶¶ 52-53).

24

¶ 69        In *Dorsey*, however, the supreme court equated the parole statute with the good-conduct statutory scheme. *Dorsey*, 2021 IL 123010, ¶¶ 53-54; *Gates*, 2023 IL App (1st) 211422, ¶ 79 (Coghlan, J., dissenting) (stating that in *Dorsey* "our supreme court equated parole with good conduct credit in that, under either, 'it is in a defendant's power to shorten his sentence.' ") (quoting *Dorsey*, 2021 IL 123010, ¶¶ 53-54)). In *Dorsey*, the court also rejected the defendant's argument that "good-conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation." *Dorsey*, 2021 IL 123010, ¶ 53; *Gates*, 2023 IL App (1st) 211422, ¶ 79 (Coghlan, J., dissenting) (disagreeing with the majority that *Dorsey* is inapplicable to parole, stating that "our supreme court 'flatly reject[ed]' the notion that 'good-conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation.' "). The court in *Dorsey* stated:

> "We likewise find that it is in a defendant's power to shorten his sentence by earning good-conduct credit and that earning such credit allows a defendant the opportunity to exhibit maturity and rehabilitation. The statutory scheme here, which allows for the opportunity of release short of a *de facto* life sentence, is at least on par with discretionary parole for a life sentence, which has specifically been held by the Supreme Court to pass muster under the eighth amendment. See *Montgomery*, 577 U.S. at 212, 136 S. Ct. 718 (a life sentence for a juvenile offender does not violate *Miller* or the eighth amendment if there is a possibility of parole)." *Dorsey*, 2021 IL 123010, ¶ 54.

Accordingly, while we recognize the decision in *Gates*, under our supreme court's decision in *Dorsey,* which equated good conduct credit with discretionary parole, Aguilar's eligibility for discretionary parole and his "earliest opportunity for release" is relevant in assessing whether his sentence constitutes a *de facto* life sentence. See *Dorsey*, 2021 IL 123010, ¶¶ 1, 54; *Elliott*, 2022 IL App (1st) 192294, ¶ 56 (citing *Dorsey* and concluding that the defendant's 70-year sentence

was not a *de facto* life sentence, noting that he was eligible for parole upon serving 40 years or less). In addition to following *Dorsey*, we note that we are not bound by the appellate court's decision in *Gates*. See *O'Casek v. Children's Home and Aid Society of Illinois,* 229 Ill. 2d 421, 440 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding other districts divisions, or panels").

¶ 70    We also note that after Aguilar serves 20 years, he will be eligible for parole and, at that time, he will have the opportunity to demonstrate his maturity and rehabilitation. The parole statute "allows the Board to assess and weigh youth, its attendant circumstances, demonstrated maturity, rehabilitation, and *all* parole release factors in a manner or through a 'lens' compliant with *Graham* and *Miller*." (Emphasis in original.) *Cavazos*, 2023 IL App (2d) 220066, ¶ 59; see 730 ILCS 5/5-4.5-115(j) (West 2022) ("In considering the factors affecting the release determination under 20 Ill. Adm. Code 1610.50(b), the Prisoner Review Board panel shall consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration."). If the Board does not consider his youth and attendant circumstances or his demonstrated maturity and rehabilitation, then the denial of parole could violate the principles set forth under *Miller*. See *id.* (where the court found that the parole statute provides a meaningful opportunity for release, the court stated that, "we are certainly not suggesting that a parole hearing may operate as a sham" and "if a juvenile offender has adequately demonstrated maturity and rehabilitation, denying parole based *solely* on the seriousness of the crime could indeed violate the principles behind *Miller* and *Graham*.") (Emphasis in original.)

¶ 71                            Trial Court's Findings and *Miller*

¶ 72      Aguilar contends that his 50-year sentence violates the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution because the court's findings contradicted *Miller*'s findings regarding certain mitigating characteristics of juvenile offenders. He also argues that his sentence violated the proportionate penalties clause because it was imposed pursuant to findings about juvenile offenders that were contrary to and incompatible with Illinois's evolving standard of decency in light of Illinois law and *Miller*. We review *de novo* the question regarding whether a sentence violates the eighth amendment and the proportionate penalties clause. *Cavazos*, 2023 IL App (2d) 220066, ¶ 67.

¶ 73      Initially, we note that, "to trigger *Miller*, such that the [sentencing] court's findings here could even contradict it, [a] defendant must be sentenced to life without parole." *Id.* ¶ 68. However, as previously discussed, Aguilar was not sentenced to life without parole. See *id.* (rejecting the defendant's argument that his sentence was unconstitutional because the trial court's findings contradicted *Miller* and concluding that "his sentence is not properly considered in the constitutional framework he sets forth," as he was not sentenced to life without parole).

¶ 74      Further, as previously discussed, under *Miller*, a sentencing court must consider a juvenile offender's youth and its attendant circumstances before it imposes a life sentence (*id.* ¶ 69) and under section 5-4.5-105(a) of the Code, the court is required to consider additional factors (*Buffer*, 2019 IL 122327, ¶ 36). As previously discussed, the record shows that the sentencing court considered the factors in *Miller* and the provisions set forth in section 5-4.5-105(a) when it sentenced him. The trial court expressly stated that it reviewed the arguments presented, and it reviewed and provided summaries on the mitigation evidence, including the PSI, defense mitigation packet, Aguilar's statement in allocation, and the testimony. The court also expressly

stated that it found Aguilar's youth and attendant immaturity to be mitigating and that he had potential for rehabilitation.

¶ 75 Further, Aguilar's argument that the court's findings contradicted and were incompatible with *Miller* and Illinois's evolving standard of decency challenges the weight the court gave to the mitigating factors, including impetuosity, peer pressure, and rehabilitation. See *Cavazos*, 2023 IL (2d) 220066, ¶ 69 (rejecting the defendant's argument that his sentence was unconstitutional because the court's findings contradicted *Miller*, and noting that the defendant disagreed "with the length of the sentence imposed *after* the court considered" the *Miller* factors and section 5-4.5-105(a) and, "in effect, the weight the court gave them") (Emphasis in original.) As discussed below, as a reviewing court, we will not reweigh the sentencing factors even if we would have weighed the factors differently. See *People v. Alexander*, 239 Ill. 2d 205, 213 (2010) (citations omitted) (stating that the reviewing court must rely on a "cold record" and "must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently").

¶ 76                                    Excessive Sentence

¶ 77 Aguilar contends that his sentence is excessive in light of his youth, significantly diminished moral culpability, and potential for rehabilitation. He argues the court overlooked and misconstrued critical mitigation evidence when it found that he provided conflicting statements on his family relationships, gang involvement, childhood abuse, and substance abuse.

¶ 78 The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *Hill*, 2022 IL App (1st) 171739-B, ¶ 45. "This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of

28

punishment." *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 93. To do so, the sentencing court must consider "all factors in aggravation and mitigation, including, 'the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it.' " *Id.* ¶ 93 (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)).

¶ 79 Further, the sentencing court "has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *Alexander*, 239 Ill. 2d at 212. "[T]he trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. "Thus, we will not substitute our judgment for that of the trial court merely because we would have weighed relevant factors differently." *Elliott*, 2022 IL App (1st) 192294, ¶ 57. Further, "[a] sentence within the appropriate sentencing range is generally accorded great deference by this court." *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 72. We review an excessive sentence claim for an abuse of discretion. *Snyder*, 2011 IL 111382, ¶ 36. "[A]n abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Colon*, 2018 IL App (1st) 160120, ¶ 66.

¶ 80 Here, Aguilar was sentenced to 25 years in prison for first degree murder, which falls well within the applicable sentencing range of 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2022)). Aguilar personally discharged a firearm that proximately caused the victim's death, so the sentencing court used its discretion to impose a consecutive 25-year firearm enhancement. 730 ILCS 5/5-8-1(d)(iii) (West 2022); 730 ILCS 5/5-4.5-105(b) (West 2022). Because Aguilar's 50-

year sentence falls within these statutory ranges, it is presumed to be proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 ("when a sentence falls within the statutory guidelines, it is presumed to be proper").

¶ 81 Aguilar nevertheless argues that his sentence is excessive when compared to the overwhelming mitigation evidence presented at the resentencing hearing. He also argues that the court overlooked the mitigation evidence.

¶ 82 There is nothing in the record to indicate that the court did not consider any of the mitigation evidence presented. See *People v. Lopez*, 2019 IL App (3d) 170798, ¶ 23 (" 'Where relevant mitigating evidence is before the court, it is presumed that the court considered it absent some indication in the record to the contrary other than the sentence itself.' ") (quoting *People v. Dominguez,* 255 Ill. App. 3d 995, 1004 (1994)). Further, the sentencing court was not required to articulate each factor it considered. See *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31 ("the trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender, and that omission does not mean the trial court did not consider all relevant factors"). In addition, we find that Aguilar's argument that the court "overlooked" critical mitigation evidence challenges the weight the court gave to the mitigating factors, and we will not reweigh the sentencing factors. See *People v. Paige*, 2023 IL App (1st) 220925, ¶ 54-U (where the defendant argued that the sentencing court "downplayed" and "discounted" certain mitigating factors, the reviewing court stated he was essentially challenging how the court weighed the factors, and "[a] reviewing court will not find a sentence improper merely because it would have weighed the factors differently"); see also Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (unpublished Rule 23 orders filed on, or after, January 1, 2021, "may be cited for persuasive purposes").

¶ 83    Aguilar also contends that we should remand for resentencing because the court misconstrued the mitigation evidence. He asserts that the court incorrectly found that Aguilar provided conflicting and inconsistent information about his family relationships, substance abuse, the physical abuse he experienced as a child, and how he became involved with a gang. From our review of the sentencing court's order, we do not agree that the court misconstrued the evidence. Rather, the court provided detailed summaries of Aguilar's statements regarding his family history, gang involvement, rehabilitation, and substance abuse, that were contained in the PSI and defense mitigation report. We cannot find that the court's statements that Aguilar provided conflicting information on these topics shows that the court misconstrued the evidence or that it did not consider the relevant mitigating factors.

¶ 84    Aguilar argues that the sentencing court misunderstood some of the statutory factors set forth in section 5-4.5-105(a) or improperly treated them as aggravating and that therefore his sentence is based on improper sentencing factors. We disagree. As previously discussed, there is nothing to indicate that the court did not consider any of the mitigation evidence that Aguilar presented or the factors in *Miller* or provisions in section 5-4.5-105(a). Further, the State may challenge the mitigation evidence presented as well as the weight and assessment that a defendant gives to certain mitigation factors, and the court may weigh the factors differently than they were presented. See *Paige*, 2023 IL App (1st) 220925, ¶ 42-U (noting that the State may contest the "significance or weight" of the mitigation evidence and "it is not 'improper for a [sentencing court] to consider a defendant's evidence presented in mitigation as a factor in aggravation.' ") (quoting *People v. McNeal*, 175 Ill. 2d 335, 369 (1997)).

¶ 85    Further, under section 5-4.5-105(a), two of the factors a court considers are "the circumstances of the offense" and the "person's degree of participation and specific role in the

31

offense, including the level of planning by the defendant before the offense." 730 ILCS 5/5-4.5-105(a)(5), (6) (West 2022); *Merriweather*, 2022 IL App (4th) 210498, ¶ 35. Here, the sentencing court concluded that the offense was "not an impetuous act," finding that Aguilar was riding a bike with a loaded gun and acted alone when he boldly and purposefully approached four young men and asked them about their gang affiliation. The court stated that Aguilar was the only person with a gun and there was no provocation by the group or outside peer pressure from anyone when he fired his gun multiple times at people who were running away from him. The court was not prohibited from considering the circumstances of the offense or Aguliar's degree of participation in it as aggravating evidence. See *Paige*, 2023 IL App (1st) 220925, ¶ 42-U ("Nothing in section 5-4.5-105 prohibited the court from considering the circumstances of the offense, or defendant's degree of participation in the offense, as aggravating if the evidence supported that characterization"); *Merriweather*, 2022 IL App (4th) 210498, ¶ 35.

¶ 86    In addition, the court expressly found that Aguilar's age and attendant immaturity was mitigating, and it acknowledged his potential for rehabilitation. However, the court was not required to give more weight to Aguilar's rehabilitative potential than to the seriousness of the offense. See *Cavazos*, 2023 IL App (2d) 220066, ¶ 73 ("a sentencing is not required to give rehabilitative potential greater weight than the seriousness of the offense").

¶ 87    Aguilar also asserts that the sentencing court misstated facts about the original sentencing hearing because it stated that Aguilar made a statement in allocution at the original hearing when he did not do so. From our review of the record as a whole, we do not find that the court relied on or gave important weight to this incorrect fact when reaching its sentencing decision. See *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986) (stating that "the determination of

whether or not the sentence was improper must be made by considering the entire record as a whole").

¶ 88    Lastly, the court noted in its order that under the parole statute, Aguilar "has the possibility of release after serving 20 years, upon a showing of his growth and maturity during incarceration." The court also stated that he "has a chance to prepare himself for the outside world. He can learn a trade in prison, or get the GED he has said since 2007 that he wants to get, and continue further schooling. He can stop his gang activities, violent behavior and pummeling other inmates." Aguilar's parole eligibility supports the finding that his sentence is not greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. See *Elliott*, 2022 IL App (1st) 192294, ¶ 59 (where the defendant argued his sentence was excessive for "reasons that parallel a *Miller*-type claim," the court concluded that the defendant's "eligibility for parole was relevant" and "militates against finding his sentence excessive, greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense").

¶ 89    Accordingly, from our review of the record, the sentencing court did not abuse its discretion when it resentenced Aguilar to 50 years in prison.

¶ 90                                   III. CONCLUSION

¶ 91    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 92    Affirmed.